IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,

               Plaintiff,

      v.

                                          Civil No. - - - - - - - - - - - - - - - - - -

CHEMICAL SOLVENTS, INC.,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**CONSENT DECREE**

**TABLE OF CONTENTS**

I.      JURISDICTION AND VENUE ........................................................................................3

II.     APPLICABILITY.........................................................................................................3

III.    DEFINITIONS.............................................................................................................4

IV.     CIVIL PENALTY ........................................................................................................11

V.      COMPLIANCE REQUIREMENTS ...............................................................................12

       A.      Air Emissions Requirements.............................................................................12

       B.      Water Requirements ........................................................................................30

       C.      Approval of Deliverables .................................................................................36

VI.     26 U.S.C. SECTION 162(F)(2)(A)(II) IDENTIFICATION ...........................................37

VII.    REPORTING REQUIREMENTS ...................................................................................38

VIII.   STIPULATED PENALTIES ..........................................................................................40

IX.     FORCE MAJEURE .....................................................................................................45

X.      DISPUTE RESOLUTION ............................................................................................47

XI.     INFORMATION COLLECTION AND RETENTION ......................................................49

XII.    EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS............................................51

XIII.   COSTS .....................................................................................................................53

XIV.    NOTICES ..................................................................................................................54

XV.     EFFECTIVE DATE .....................................................................................................55

XVI.    RETENTION OF JURISDICTION .................................................................................55

XVII.   MODIFICATION ........................................................................................................55

XVIII.  TERMINATION ..........................................................................................................56

XIX.    PUBLIC PARTICIPATION ..........................................................................................57

XX.     SIGNATORIES/SERVICE............................................................................................57

XXI.    INTEGRATION ..........................................................................................................58

XXII.   FINAL JUDGMENT ....................................................................................................58

XXIII.  APPENDIX................................................................................................................58

Plaintiff United States of America, on behalf of the United States Environmental Protection Agency ("EPA"), has filed a complaint in this action, concurrently with the lodging of this Consent Decree, alleging that Defendant, Chemical Solvents, Inc., violated the Clean Air Act ("CAA"), the Clean Water Act ("CWA"), the Resource Conservation and Recovery Act ("RCRA"), their implementing regulations, and Defendant's related permits.

Defendant operates a solvent reclamation, chemical blending, and commodity chemicals business near the intersection of Jennings Road and Old Denison Road in southern Cleveland. The United States' complaint alleges that Defendant has committed or continues to commit the following types of violations at the Facility:

- Violations of the federally enforceable State Clean Air Act operating permit and the State Implementation Plan at Ohio Admin. Code §§ 3745-31-05 and 3745-21-07;

- Violations of the RCRA Air Emission Regulations: 40 C.F.R. Part 264, Subpart AA, at 40 C.F.R. §§ 264.1032(a), 264.1033(b), (f), (h), (k), (l)-(n), and 264.1035(b) and (c); Subpart BB, at 40 C.F.R. § 264.1063(b)(4)(i); and Subpart CC, at 40 C.F.R. §§ 264.1084(c)(2)-(3), and (g)(2), and 264.1087(b) and (c);

- Violations of the requirements governing hazardous waste treatment, storage, and disposal facilities found in its State RCRA Permit, Ohio Admin Code §§ 3745-54-31, and 40 C.F.R. § 264.31;

- Violations of the requirements governing the generation and transport of hazardous waste found in its State RCRA Permit, Ohio Admin. Code §§ 3745-52-11 and 3745-52-20, and 40 C.F.R. §§ 262.11 and 262.20;

- Violations of the pretreatment requirements of administrative orders issued by the Northeast Ohio Regional Sewer District ("NEORSD") , 40 C.F.R. § 403.5(d), and 33

1

U.S.C. § 1317(d); and

- Violations of the State Clean Water Act general permit OHR000005 and OHR000006 (multi-sector general permits for storm water discharges associated with industrial activities) and 33 U.S.C. § 1342.

EPA issued Clean Air Act notices of violation to Defendant on September 28, 2012 and December 3, 2014, while also providing notice to the State of Ohio. EPA issued RCRA notices of violation to Defendant on March 4, 2010, April 30, 2012, January 22, 2013, and August 29, 2014, while also providing notice to the State of Ohio. NEORSD issued notices of violation to Defendant for violations of NEORSD administration orders on January 11, 2008, August 31, 2011, November 22, 2013, September 26, 2014, October 31, 2014, November 7, 2014, April 24, 2015, August 8, 2016, February 21, 2017, February, 23, 2017, March 31, 2017, April 24, 2017, June 5, 2017, September 8, 2017, October 19, 2017, December 6, 2017, March 2, 2018, April 3, 2018, April 9, 2018, May 31, 2018, and June 18, 2018. Defendant contests these notices of violation.

Defendant does not admit any liability to the United States arising out of the transactions, violations, or occurrences alleged in the Complaint.

The Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid litigation between the Parties and that this Consent Decree is fair, reasonable, and in the public interest.

NOW, THEREFORE, before the taking of any testimony, without the adjudication or admission of any issue of fact or law except as provided in Section I, and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## I.      JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of this action—pursuant to

28 U.S.C. §§ 1331, 1345, and 1355; CAA § 113(b), 42 U.S.C. § 7413(b); CWA § 309(b), 33

U.S.C. § 1319(b); and RCRA § 3008(a), 42 U.S.C. § 6928(a)—and over the Parties.  Venue lies

in this District pursuant to CAA § l13(b), 42 U.S.C. § 7413(b); CWA § 309(b), 33 U.S.C. §

1319(b); RCRA § 3008(a), 42 U.S.C. § 6928(a); and 28 U.S.C. §§ 1391(b), (c) and 1395(a),

because the violations alleged in the Complaint are alleged to have occurred in, and Defendant

conducts business in, this judicial district.  For purposes of this Decree, or any action to enforce

this Decree, Defendant consents to the Court's jurisdiction over this Decree and any such action

and over Defendant and consents to venue in this judicial district.

2.      For purposes of this Consent Decree, Defendant agrees that the Complaint states

claims upon which relief may be granted pursuant to the Clean Air Act, Clean Water Act, and/or

RCRA.

## II.     APPLICABILITY

3.      The obligations of this Consent Decree apply to and are binding upon the United

States and upon Defendant and any successors, assigns, or other entities or persons otherwise

bound by law.

4.      No transfer of ownership or operation of the Facility, whether in compliance with

the procedures of this Paragraph or otherwise, shall relieve Defendant of its obligation to ensure

that the terms of the Decree are implemented.  At least 30 Days prior to such transfer, Defendant

shall provide a copy of this Consent Decree to the proposed transferee and shall simultaneously

provide written notice of the prospective transfer, together with a copy of the proposed written

agreement, to EPA, the United States Attorney for the Northern District of Ohio, and the United

States, in accordance with Section XIV (Notices). Any attempt to transfer ownership or operation of the Facility without complying with this Paragraph constitutes a violation of this Decree.

5.      Defendant shall provide a copy of this Consent Decree to all officers, employees, and agents whose duties might reasonably include compliance with any provision of this Decree, as well as to any contractor retained to perform work required under this Consent Decree. Defendant shall condition any such contract upon performance of the work in conformity with the terms of this Consent Decree.

6.      In any action to enforce this Consent Decree, Defendant shall not raise as a defense the failure by any of its officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

### III.    DEFINITIONS

7.      Terms used in this Consent Decree that are defined in the Clean Air Act, Clean Water Act, RCRA, or in regulations promulgated pursuant to those statutes shall have the meanings assigned to them in the statutes or such regulations, unless otherwise provided in this Decree. Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

"Air Permit" shall mean Defendant's Air Pollution Permit-to-Install and Operate, issued by Ohio EPA January 4, 2017.

"Atmospheric Conservation Vent" shall mean a closure device on a tank used for routine venting to the atmosphere of gases or vapors from the vapor headspace underneath the tank cover, such as during filling of the tank or to adjust the pressure in this vapor headspace in response to normal daily diurnal ambient temperature fluctuations.

"Closed Vent System" shall mean a system that is not open to the atmosphere and that is composed of piping, connections, and, if necessary, flow-inducing devices that transport gas or vapor from a piece or pieces of equipment to a control device.

"Collection System" shall mean the sewer system operated by NEORSD that conveys flow to the Jennings Road Pump Station.

"Complaint" shall mean the complaint filed by the United States in this action.

"Consent Decree" or "Decree" shall mean this Decree and the appendix attached hereto (listed in Section XXIII).

"Continuous" or "continuously" shall mean:

- *For a pollution control system*: that when a control system is required to be continuously used pursuant to this Consent Decree, it shall be operated at all times an emission unit routed to it is operating, consistent with manufacturers' specifications, good engineering and maintenance practices, and good air pollution control practices for minimizing emissions (as defined in 40 CFR 264.1033(m)) for such equipment.

- *For a parametric monitoring system*: that when a parametric monitoring system is required to be continuously operated pursuant to this Consent Decree, it shall be operated at all times except for system breakdowns, repairs, and maintenance periods.

"Covered Equipment" shall mean all valves (except pressure relief valves and atmospheric conservation vents), pumps, agitators, and open ended lines in light liquid service or gas/vapor service, connectors in light liquid service or heavy liquid service, sampling connections systems, and all tank vents routed through a Closed Vent System to the Denison Control System or Jennings Control System.

"Covered Violations" shall mean the violations alleged in the Complaint and in the following notices of violation:

- The Clean Air Act notices of violation that EPA issued to Defendant on September 28, 2012, and December 3, 2014, except that the Covered Violations do not include those alleged in paragraphs 98 through 116 of the September 28, 2012 notice;

- The RCRA notices of violation EPA issued on March 4, 2010, April 30, 2012, January 22, 2013, and August 29, 2014; and

- The notices of violation NEORSD issued to Defendant for violations of NEORSD administrative orders on January 11, 2008, August 31, 2011, November 22, 2013, September 26, 2014, October 31, 2014, November 7, 2014, April 24, 2015, August 8, 2016, February 21, 2017, February, 23, 2017, March 31, 2017, April 24, 2017, June 5, 2017, September 8, 2017, October 19, 2017, December 6, 2017, March 2, 2018, April 3, 2018, April 9, 2018, May 31, 2018, and June 18, 2018.

"Day" shall mean a calendar day unless expressly stated to be a business day.  In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal holiday, the period shall run until the close of business of the next business day.

"Defendant" shall mean Chemical Solvents, Inc.

"Denison" shall mean the portion of Chemical Solvents, Inc. located at 1010 Old Denison Road, Cleveland, Ohio.

"Denison Control System" shall mean the condenser control system designed to control air emissions at Denison.  The condenser control system currently consists of an API Heat Transfer Type AHT, size 6-Y-48 condenser with 48 square feet of surface area, a vacuum pump, and a regenerative blower rated at 150 cfm.  The Denison Control System shall not include the LUWA product condensers.

6

"Denison Product Tanks" shall mean any tanks at Denison that contain material(s) that do not meet the definition of hazardous waste set forth in 40 C.F.R. § 261.3.  At the time of lodging, the Denison Product Tanks are called tanks T3 through T48.

"Domestic Wastewater" shall have the meaning set forth in 40 CFR § 122.2.

"Discharge" shall mean the introduction of pollutants into a POTW from any non-domestic source, or any addition of any pollutant to navigable waters or the environment from any point source at the Jennings or Denison facilities.

"EPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies.

"Effective Date" shall have the definition provided in Section XV.

"Facility" shall mean both Denison and Jennings, as defined herein.

"Flow Indicator" shall mean a device that indicates whether gas flow is present in a vent stream.

"Hazardous air pollutant" or "HAP" shall mean any air pollutant listed in or pursuant to Section 112(b) of the CAA, 42 U.S.C. § 7412(b).

 "Independent" shall mean a third party that is not employed by CSI and is not currently providing services to CSI (other than for work required by the Consent Decree or the ongoing state RCRA corrective action at the Facility).  For purposes of this definition, Enviromatrix, and any of its officers, shareholders, employees, and assigns as of the Date of Entry, shall not be considered independent.

"In light liquid service" shall have the meaning set forth in 40 CFR § 264.1031.

"Jennings" shall mean the portion of Chemical Solvents, Inc. located at 3751 Jennings Road, Cleveland, Ohio.

"Jennings Control System" shall mean the system designed to control air emissions at Jennings.  At the date of lodging, the Jennings Control System consists of a single condenser and water chiller.

"LDAR" or "Leak Detection and Repair" shall mean the leak detection and repair activities required by any "equipment leak" provisions of 40 C.F.R. Part 264, Subpart BB, and this Consent Decree. In addition, LDAR shall mean any state or local equipment leak provisions that: (i) require the use of Method 21 to monitor for equipment leaks and also require the repair of leaks discovered through such monitoring; and (ii) are intended to minimize emissions of hazardous air pollutants or other substances identified on the basis of toxicity (*e.g.*, toxic air contaminants).

"LDAR Affected Source" shall mean any component that is subject to LDAR requirements referenced in 40 C.F.R. Part 264, Subpart BB – Air Emission Standards for Equipment Leaks (*e.g.*, applicability of regulations to specific equipment; leak definitions; and monitoring frequencies) and Covered Equipment.

"LDAR Audit Commencement Date" or "Commencement of an LDAR Audit" shall mean the first day of the on-site inspection that accompanies an LDAR audit.

"LDAR Audit Completion Date" or "Completion of an LDAR Audit" shall mean the date that is 120 days after the LDAR Audit Commencement Date.

"Lower Explosive Limit" or "LEL" shall mean the minimum concentration in air at which a gas or vapor will flame with an ignition source.

"LUWA" shall mean one of the two thin-film evaporators, known as LUWAs 1 and 2, Defendant has used at Denison to reclaim waste solvent.

"LUWA Collection Sump" shall mean the LUWA wastewater holding pit as described in the Fact Sheet of NEORSD Administrative Order No. CSID-S-SIU-17R.

"NEORSD" shall mean the Northeast Ohio Regional Sewer District.

"Non-contact cooling water" shall mean water used for cooling which does not come into direct contact with any raw material, intermediate product, waste product, or finished product.

"Paragraph" shall mean a portion of this Decree identified by an arabic numeral.

"Parties" shall mean the United States and Defendant.

"Point source" means any discernable, confined, and discrete conveyance, including but not limited to, any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, or container from which a pollutant is or may be discharged.

"Pressure Relief Valve" shall mean a safety device or emergency vent used to prevent physical damage or permanent deformation to a tank by automatically opening to release gas or liquid when pressure inside the tank reaches a certain level.

"Process wastewater" shall mean any water that, during manufacturing or processing, comes into direct contact with or results from the production or use of any raw material, intermediate product, finished product, by-product, or waste product.

"Publicly Owned Treatment Works" or "POTW" shall have the meaning set forth in 40 CFR § 403.3(q).

"RCRA Permit" shall mean the Ohio Hazardous Waste Facility Installation and Operation Permit, issued February 2, 2005 and renewed June 9, 2017.

"Section" shall mean a portion of this Decree identified by a roman numeral.

"State" shall mean the State of Ohio.

"Storm water" shall mean storm water runoff, snow melt runoff, and surface runoff and drainage.

"Tank" shall mean a stationary unit that is constructed primarily of non-earthen materials (such as wood, concrete, steel, fiberglass, or plastic) which provide structural support and is designed to hold an accumulation of liquids or other materials.

"Tank Equipment" shall mean pressure relief valves, atmospheric conservation vents, thief hatches, mounting, gaskets, vacuum breakers, and any other openings on tanks not routed to the Denison Vapor Balancing System or routed through a Closed Vent System to the Denison Control System or Jennings Control System.

"United States" shall mean the United States of America, acting on behalf of EPA.

"Vapor Balancing System" shall mean: (1) A piping system that collects organic HAP vapors and VOC emissions displaced from transport vehicles during loading and routes the collected vapors to the storage tank from which the liquid being loaded originated or to another storage tank connected to a common header; or (2) A piping system that collects organic HAP vapors and VOC emissions displaced from the loading of a storage tank and routes the collected vapors to the transport vehicle from which the storage tank is filled.

"Waste Tanks" shall mean any tanks that contain materials that meet the definition of hazardous waste set forth in 40 C.F.R. § 261.3.

"Wastewater" means any water discharged from the Facility.  This includes domestic wastewater, dilutional wastewater, process wastewater, and storm water.

"Wastewater System" shall mean the pipes, pumps, tanks, valves, and other conveyances and structures used to convey, store, or treat wastewater.

## IV.    CIVIL PENALTY

8.      Defendant shall pay the sum of $400,000 as a civil penalty. Defendant may pay the civil penalty in two installments:

- A payment of $200,000, plus interest, to be made within 30 days of the Effective Date; and

- A payment of $200,000, plus interest, to be made by December 31, 2019, or 30 days of the Effective Date, whichever is later.

As part of each payment, Defendant shall add the payment of interest accruing from the date on which the Consent Decree is lodged with the Court, at the rate specified in 28 U.S.C. § 1961 as of the date of lodging.

9.      Defendant shall pay the civil penalty due by FedWire Electronic Funds Transfer ("EFT") to the U.S. Department of Justice account, in accordance with instructions provided to Defendant by the Financial Litigation Unit ("FLU") of the United States Attorney's Office for the Northern District of Ohio after the Effective Date.  The payment instructions provided by the FLU will include a Consolidated Debt Collection System ("CDCS") number, which Defendant shall use to identify all payments required to be made in accordance with this Consent Decree. The FLU will provide the payment instructions to:

> Bruce Cahill
> 3751 Jennings Road
> Cleveland, OH 44109
> bcahill@chemicalsolvents.com
> 216-741-9310

on behalf of Defendant.  Defendant may change the individual to receive payment instructions on its behalf by providing written notice of such change to the United States and EPA in accordance with Section XIV (Notices).

11

10.     At the time of payment(s), Defendant shall send notice that payment has been made to:

(i) EPA via email at cinwd_acctsreceivable@epa.gov or via regular mail at EPA Cincinnati Finance Office, 26 W. Martin Luther King Drive, Cincinnati, Ohio 45268;

(ii)  the United States in accordance with Section XIV; and

(iii) EPA in accordance with Section XIV.

Such notice shall state that the payment is for the civil penalty owed pursuant to the Consent Decree in *United States v. Chemical Solvents, Inc.* and shall reference the civil action number, CDCS Number, and DOJ case number 90-7-1-11189.

11.     Defendant shall not deduct any penalties paid under this Decree pursuant to this Section or Section VIII (Stipulated Penalties) in calculating its federal income tax.

## V.     COMPLIANCE REQUIREMENTS

### A.     Air Emissions Requirements

12.     Defendant shall comply with:

a.     The RCRA Air Emission Regulations at 40 C.F.R. Part 264, Subparts AA and BB, including the Process Vent and Equipment Leak Organic Air Emission Standards for Owners and Operators of Hazardous Waste Treatment, Storage, and Disposal Facilities, codified at 40 C.F.R. § 264.1030-1065; and

b.     The RCRA Air Emission Regulations at 40 C.F.R. Part 264, Subpart CC, including the Air Emission Standards for Tanks, Surface Impoundments, and Containers, codified at 40 C.F.R. § 264.1080-1090.

13.     Starting no later than the Effective Date, Defendant shall

a.     Limit its annual HAP emissions from the Facility to below 10 tons per year

("tpy") for a single HAP and 25 tpy of combined HAPs; and

       b.    Evaluate and comply with any area source standards that apply to the

Facility under 40 C.F.R. Parts 60, 61, or 63, including specifically 40 C.F.R. Part 63, Subpart

VVVVVV.

### 1.  Air Pollution Control Devices

14.    <u>Denison Control System</u>.  Within 60 days of the Effective Date, Defendant shall

operate and maintain the Denison Control System to continuously recover 95 percent or more, on

a weight-basis, of the total organic compounds ("TOCs") and HAPs for all emissions required to

be routed to the Denison Control System in Paragraph 21.  The performance test required by

Paragraph 17 shall be used to establish the conditions and parameters for continuous compliance.

15.    <u>Jennings Control System</u>.  Defendant shall continue to operate and maintain the

Jennings Control System to continuously recover 90 percent or more, on a weight-basis, of the

TOCs and HAPs for all emissions required to be routed to the Jennings Control System in

Paragraph 21.  The performance test required by Paragraph 17 shall be used to establish the

conditions and parameters for continuous compliance.

16.    <u>Proposed Performance Test Protocol.</u>  Within 90 days of EPA's approval of the

Tank Evaluation Report required by Paragraph 37.d, Defendant shall submit to EPA for review

and approval a proposed testing protocol that describes the methods and procedures for testing

required by the following Paragraph.  Sampling and analysis procedures shall follow the EPA

test methods in 40 C.F.R. § 60, Appendix A.  The proposed testing protocol shall also include the

operating parameters that will be monitored during the proposed testing, including temperature

of the condenser exhaust vent stream, and information, such as the throughput rate, that

establishes that the testing will be conducted at representative operating conditions.

17.    Performance Test.  Within 120 days of EPA's approval of the proposed testing protocol pursuant to the preceding Paragraph, Defendant shall conduct a performance test of the Denison Control System and the Jennings Control System in accordance with the EPA Reference Methods in 40 C.F.R. Part 60: Method 2 and Method 18 or 25A to determine compliance with the control device percent reduction requirement during representative operating conditions and determine the associated operating parameters, including the temperature of the condenser exhaust vent stream.  Testing shall be conducted in accordance with 40 C.F.R. § 264.1034(c).

18.    Performance Test Report.  Within 60 days of conducting the performance tests of the Denison Control System and the Jennings Control System, Defendant shall submit to EPA a report of the performance. This report shall include:

    a.    Summary of Results

(1)    Results of the above-specified emission tests;

(2)    Process and control equipment data;

(3)    Discussion of any test errors;

(4)    Discussion of any deviations from the reference test methods; and

(5)    Production data.

    b.    Facility Operations

(1)    Description of the process and control equipment in operation;

(2)    Operating parameters of the emission units;

(3)    Operating parameters of the control equipment while operating, including but not limited to the condenser exhaust vent stream temperature; and

(4)    Facility operating parameters that demonstrate that the Facility was being operated at representative operating conditions at the time of the test.

    c.    Sampling and Analytical Procedures

(1)    Sampling port location(s) and dimensions of cross-section;

14

(2)      Sampling point description, including labeling system;

(3)      Brief description of sampling procedures, including sampling equipment and sampling diagram;

(4)      Description of any sampling procedures (planned and accidental) that deviated from any standard method;

(5)      Brief description of analytical procedures, including calibration;

(6)      Description of analytical procedures (planned and accidental) that deviated from any standard method;

(7)      Quality control / quality assurance procedures, tests, and results; and

(8)      Any other information Defendant deems appropriate to include.

    d.    Appendix

(1)      Complete test results with appropriate calculations;

(2)      Raw field data (copies of originals, not computer printouts);

(3)      Laboratory report, with signed chain-of-custody forms;

(4)      Calibration procedures and results;

(5)      Raw process and control equipment data, signed by plant representative;

(6)      Test log;

(7)      Project participants and titles; and

(8)      Related correspondence.

19.    _Flow Indicators_.  Within 30 days of the Effective Date, Defendant shall install, maintain, and continuously operate air Flow Indicators that show whether there is vent stream air flow in between each process vent and the Denison Control System.  At a minimum, Defendant shall install such indicators on the outlets of LUWA 1 (if operating), LUWA 2, Tank F1, and Tank F2 at Denison. Each air Flow Indicator shall be installed in the vent stream at the nearest feasible point to the control device inlets, but before the vent stream is combined with other vent

15

streams. The air Flow Indicators shall indicate whether flow is occurring at least once every 15 minutes, and CSI shall record the results.

20.      Temperature Monitoring.  Within 30 days of the Effective Date, Defendant shall install, maintain, and continuously operate continuous parameter monitoring systems to measure and record the daily average temperature of the exhaust gases from the Denison Control System and the Jennings Control System individually. Each temperature monitoring device shall be at least as accurate as ±1 percent of the temperature being measured in degrees Celsius or ±0.5 °C, whichever is greater.

**2.  Venting of Air Emissions**

21.      Defendant shall vent emission streams from thin film evaporation units, loading racks, and all waste and product tanks through a Closed Vent System to the Denison Control System or to the Jennings Control System, except that Defendant need not vent emission streams from the Denison Product Tanks, so long as Defendant complies with the Vapor Balancing System requirements in Paragraph 41 for the Denison Product Tanks. The Denison Control System, including the Closed Vent System, shall be designed and operated as required by 40 C.F.R. § 264.1033.  The Jennings Control System, including the Closed Vent System, shall be designed and operated in accordance with 40 C.F.R. § 264.1033.

22.      Within 60 days of the Effective Date, Defendant shall operate each Closed Vent System with no detectable emissions, as determined by an instrument reading of less than 500 ppmv above background pursuant to the procedure in 40 C.F.R. § 264.1034(b), and by visual inspections.

### 3.  Leak Detection and Repair

23.      Facility LDAR Plan.  Within 30 days of the Effective Date, Defendant shall

develop and submit to EPA for review and approval an LDAR Plan that describes, for its

Facility: (i) the LDAR program as it applies to LDAR Affected Sources; (ii) a tracking program

(*e.g.*, Management of Change) that ensures that new Covered Equipment added at the Facility for

any reason is, as applicable, integrated into the LDAR program and that pieces of equipment that

are taken out of service are, as applicable, removed from the LDAR program; (iii) the roles and

responsibilities of all employee and contractor personnel assigned to LDAR functions; and

(iv) how the number of personnel dedicated to LDAR functions is sufficient to satisfy the

requirements of the LDAR program.  Defendant shall review this document on an annual basis

and update it as needed by no later than December 31 of each year.  Defendant shall keep a copy

of the most recent version of this document available at its Facility.

24.      LDAR Monitoring.

         a.      Within 30 days of the Effective Date, Defendant shall control HAPs and

TOCs emitted from equipment leaks from Covered Equipment.

         b.      Within 30 days of the Effective Date, Defendant shall begin LDAR

monitoring of Covered Equipment using the following periodic monitoring frequencies unless:

(i) more frequent monitoring is required by federal, state, or local laws or regulations; or (ii) the

relevant LDAR Affected Source has been permanently shut down or does not operate during the

entire applicable monitoring period:

         (1)      Valves – Quarterly;

         (2)      Connectors – Annually;

         (3)      Pumps / Agitators – Monthly, except that monitoring shall not be required
         for pumps and agitators that are equipped with a dual mechanical seal system that
         complies with the requirements of 40 C.F.R. § 264.1052(d); and

(4)     Open-Ended Lines – Quarterly (monitoring will be done at the closure device; if the closure device is a valve, monitoring will be done in the same manner as any other valve, but also shall include monitoring at the end of the valve or line that is open to the atmosphere).

c.     Defendant shall perform the required LDAR monitoring using either a Toxic Vapor Analyzer 2020 Flame Ionization Detector ("FID") attached to a data logger or an equivalent monitoring device attached to a data logger that has been approved by EPA.  The same device shall be used for monitoring TOCs and HAPs.  Such monitoring device shall record and save an electronic reading of the screening value detected at each piece of Covered Equipment, the date and time that each screening value was measured, the identification number of the monitoring instrument, the identification number of the piece of equipment being monitored, and the technician taking the measurements.

d.     Defendant shall, as part of the annual reports required by Section VII, include a summary of its LDAR monitoring for the previous year.  The report shall include the number of each type of LDAR Affected Source, including valves, pumps, compressors, agitators, and connectors for which leaks were detected, percentage of each type of source that had leaks detected, and the total number of each type of equipment monitored. Additionally, it shall include the number of each type of LDAR Affected Source and the identifier for each LDAR Affected Source for which leaks were not repaired, the facts that explain any delay of repairs, the date the leak was found and, where appropriate, why an LDAR Affected Source shutdown was technically infeasible.

25.     LDAR Calibration.  Defendant shall conduct LDAR monitoring calibration in accordance with Method 21 of 40 C.F.R. Part 60, Appendix A, prior to and after each day of monitoring.  Defendant shall keep records of calibrations that include the date and time of

calibration, the instrument calibrated, the expiration dates of the calibration gases, the technician performing the calibration, and meter readings for zero gas and the specified calibration gases.

26. <u>Certification</u>. Commencing by no later than 30 days after the Effective Date, on each day that LDAR monitoring occurs, at the end of such monitoring, Defendant shall ensure that each monitoring technician certifies that the data collected accurately represents the monitoring performed for that day by requiring the monitoring technician to sign a form that includes the following certification:

> On [insert date], I reviewed the monitoring data that I collected today and to the best of my knowledge and belief, the data accurately represent the monitoring that I performed today.

27. <u>Quality Assurance/Quality Control ("QA/QC")</u>. Commencing by no later than the first full calendar quarter after the Effective Date, and at least once per calendar quarter thereafter, at times that are not announced to the LDAR monitoring technician(s), an LDAR-trained employee or contractor of Defendant, who does not serve on a routine basis as an LDAR monitoring technician at the Facility, shall undertake the following review at the Facility:

a. Verify compliance with the LDAR Plan required by Paragraph 23;

b. Verify that equipment was monitored at the appropriate frequency under applicable LDAR regulations;

c. Verify that proper documentation and sign-offs have been recorded for all equipment placed on the delay of repair list;

d. Ensure that repairs have been performed in the required periods under applicable LDAR regulations;

e. Review monitoring data and equipment counts (*e.g.*, number of pieces of equipment monitored per day) for feasibility and unusual trends;

      f.      Verify that proper calibration records and monitoring instrument maintenance information are maintained;

      g.      Verify that other LDAR program records are maintained as required; and

      h.      Observe in the field each LDAR monitoring technician who is conducting leak detection monitoring to ensure that monitoring during the quarterly period is being conducted in accordance with Method 21, as required.

28.      Defendant shall promptly correct any deficiencies detected or observed during the QA/QC.  Defendant shall maintain a log that: (i) records the date and time that the reviews, verifications, and observations required by the previous Paragraph are undertaken; and (ii) describes the nature and timing of any corrective actions taken.

29.      <u>LDAR Audits: Schedule</u>.  Until termination of this Decree, Defendant shall ensure that two LDAR audits are conducted in accordance with the following schedule: for the first LDAR audit, the LDAR Audit Commencement Date shall be no later than 120 days from the Effective Date; for the second LDAR audit, the LDAR Audit Commencement Date shall occur at least two years after the commencement date of the first LDAR audit.  The audits must be conducted by a third party, in accordance with Paragraph 30 below.

30.      <u>LDAR Audits: Third Party</u>.  Defendant shall retain a third party with experience in conducting LDAR audits to perform the LDAR audits required by this Consent Decree. Defendant shall select a different entity than the Facility's regular LDAR monitoring technician or the Facility's LDAR-trained employee or contractor that performs the quarterly QA/QC review described in Paragraph 27 to perform the third-party audit, and Defendant may not hire the Facility's regular LDAR monitoring technician or the Facility's LDAR-trained employee or contractor that performs the quarterly review as the Facility's regular LDAR contractor during

the life of this Consent Decree. Defendant shall provide EPA the name and qualifications of the proposed third party auditor in writing at least 60 days before conducting the audit. If EPA objects to the third party auditor in writing prior to the commencement of the audit, Defendant shall select another third party auditor and again submit to EPA the name and qualifications to EPA, and EPA shall have the opportunity to object to the auditor. If EPA objects to Defendant's proposed third party auditor(s), the time for performing the audit shall be extended to no later than 180 days from the Effective Date.

31. <u>LDAR Audit: Substantive Requirements</u>. Each LDAR audit shall include: (i) reviewing compliance with all applicable LDAR regulations and the LDAR Plan required by Paragraph 23, including all applicable LDAR requirements related to valves, connectors, pumps, agitators, and open-ended lines; (ii) reviewing and/or verifying the same items that are required to be reviewed in Paragraph 27; (iii) reviewing whether any pieces of equipment that are required to be in the LDAR program are not included; and (iv) "comparative monitoring" as described in Paragraph 32. LDAR audits after the first audit also shall include reviewing the Facility's compliance with Paragraphs 23-29 and 32-35 of this Decree.

32. <u>Comparative Monitoring</u>. Comparative monitoring conducted during the LDAR audits required by this Consent Decree shall be undertaken as follows:

a. <u>Calculating a Comparative Monitoring Audit Leak Percentage</u>. Equipment shall be monitored in order to calculate a leak percentage for the LDAR Affected Sources, broken down by equipment type (*i.e.*, valves, pumps, agitators, and connectors). The monitoring that takes place during the audit shall be called "Comparative Monitoring" and the leak percentages derived from the Comparative Monitoring shall be called the "Comparative Monitoring Audit Leak Percentages." In undertaking Comparative Monitoring, Defendant shall

21

not be required to monitor every component in the LDAR Affected Source.

        b.    <u>Calculating the Historical Average Leak Percentage from Prior Periodic Monitoring Events</u>.  The historical average leak percentage from prior periodic monitoring events, broken down by equipment type (*i.e.*, valves (excluding pressure relief valves), pumps, agitators, and connectors) shall be calculated.  The following number of complete monitoring periods immediately preceding the Comparative Monitoring shall be used for this purpose: valves - 4 periods; pumps and agitators - 12 periods; and connectors - 2 periods.

        c.    <u>Calculating the Comparative Monitoring Leak Ratio</u>.  For each type of equipment, the ratio of the Comparative Monitoring Audit Leak Percentage from Subparagraph 32.a to the historical average leak percentage from Subparagraph 32.b shall be calculated.  This ratio shall be called the "Comparative Monitoring Leak Ratio."  If the denominator in this calculation is "zero," it shall be assumed (for purposes of this calculation but not for any other purpose under this Decree or under any applicable laws and regulations) that one leaking piece of equipment was found in the Unit through routine monitoring during the 12-month period before the comparative monitoring.

33.    <u>More Frequent Periodic Monitoring</u>.  If a Comparative Monitoring Audit Leak Percentage calculated pursuant to Subparagraph 32.c triggers a more frequent monitoring schedule under any applicable federal, state, or local law or regulation, Defendant shall monitor the affected type of equipment at the greater frequency unless and until less frequent monitoring is again allowed under the specific federal, state, or local law or regulation.

34.    <u>Corrective Action Plan ("CAP")</u>

        a.    <u>Requirements of a CAP</u>.  Within 30 days of each LDAR Audit Completion Date, Defendant shall submit a CAP to EPA for review and approval if: (i) the results of the

LDAR audit identify any deficiencies; or (ii) a Comparative Monitoring Leak Ratio calculated pursuant to Subparagraph 32.c is 3.0 or higher *and* the Comparative Monitoring Audit Leak Percentage calculated pursuant to Subparagraph 32.a is greater than or equal to 0.5 percent.  The CAP shall describe the actions that Defendant has taken or shall take to address the deficiencies and/or the causes of the Comparative Monitoring Leak Ratio.  Defendant shall include a schedule by which actions that have not yet been completed will be completed.  Upon approval from EPA, Defendant shall implement the CAP.

       b.    <u>Submission of the CAP Report to EPA</u>.  Within 30 days of completing all actions under the approved CAP, Defendant shall submit a CAP Report to EPA, together with a certification of the completion of each item of corrective action.

       35.    <u>Certification of Compliance</u>. Within 180 days of the initial LDAR Audit Completion Date, Defendant shall certify to EPA that, to the signer's best knowledge and belief formed after reasonable inquiry: (i) except as otherwise identified, the Facility is in compliance with all applicable LDAR regulations and this Subsection V.A.3; (ii) Defendant has completed all corrective actions, if applicable, or is in the process of completing all corrective actions pursuant to a CAP; and (iii) all equipment at the Facility that is regulated under LDAR has been identified and included in the Facility's LDAR program.  To the extent that Defendant cannot make the certification in all respects, it shall specifically identify any deviations from Items (i) - (iii).

### 4.  Tank Emissions and Emission Monitoring Requirements

36.     <u>Installation of Seals on Pressure Relief Valves</u>.  Within 30 days of EPA's approval of the Tank Evaluation Report described in Paragraph 37, Defendant shall install high performance gaskets/seals, designed to limit flow to 0.5 standard cubic feet per hour (SCFH) at 95% of the set point, on the pressure relief valves on each Waste Tank at the Facility.  The seal shall use the internal tank pressure to inflate the pallet diaphragm, which creates a tighter seal the closer the tank pressure gets to the set point.

37.     <u>Tank Evaluation</u>.  Defendant shall hire a qualified, independent third-party to perform the following work within 60 days of the Effective Date:

        a.     Conduct monitoring of all Tank Equipment using the procedures specified in Method 21 of 40 C.F.R. Part 60, Appendix A. This monitoring may be conducted as part of the LDAR initial audit;

        b.     Conduct an engineering evaluation of the Closed Vent System associated with the Facility's storage tanks to ensure the system is properly designed, sized, and operated to control all emissions;

        c.     Conduct an engineering evaluation of each of the Facility's storage tanks to reduce and/or eliminate emissions not captured and controlled by the Closed Vent System or Vapor Balancing System, except during safety events.  This evaluation shall account for the range of ambient temperatures experienced at the Facility and the highest vapor pressures associated with the materials stored at the Facility in each storage tank, among other factors, and shall establish appropriate set points for the pressure relief valves to prevent breathing losses. Additionally, the third-party shall provide diagrams and/or photographs and a description for each tank of any and all openings to the headspace of the tank including Tank Equipment; and

24

d. Prepare a Tank Evaluation Report documenting the results of the monitoring, these evaluations, and recommendations on how to reduce and/or eliminate emissions not captured and controlled by the Closed Vent System or Vapor Balancing System, except during safety events, and submit this report to EPA for review and approval.

38. Within 120 days of EPA's approval of the Tank Evaluation Report, Defendant shall implement all necessary modifications based on the engineering evaluations in the preceding Paragraph.

39. <u>Inspection and Maintenance Program</u>. Within 120 days of EPA's approval of the Tank Evaluation Report, Defendant shall implement an inspection and preventative maintenance program to ensure proper operation of the Closed Vent Systems and Vapor Balancing System associated with all tanks at the Facility, including the following:

a. Defendant shall conduct quarterly monitoring of all Tank Equipment using the procedures specified in Method 21 of 40 C.F.R. Part 60, Appendix A. For any equipment that has a Screening Value at or above 500 ppm, Defendant shall repair that vent leak as specified below;

b. After recording a Screening Value of Tank Equipment at or above 500 ppm, Defendant shall perform a first attempt at repair within 5 calendar days. By no later than 15 days after detection, Defendant shall perform a final attempt at repair. Defendant shall then perform repair verification monitoring;

c. Defendant shall record the following information: the date of all repair attempts; the repair methods used during each repair attempt; and the date, time, and Screening Values for all re-monitoring events; and

d. If two quarterly monitoring events of Tank Equipment during a five-year

period show that Tank Equipment has a reading of 500 ppm above background, Defendant shall

perform an engineering evaluation of that Tank Equipment within 90 days, including an

evaluation of the appropriate pressure set point, to ensure that the Equipment is properly

designed, maintained, and operated to remain in a closed position with no detectable emissions

during normal operations.

### 5.  Jennings Containers and Denison Product Tanks

40.     _Jennings Containers_. Within 60 days of the Effective Date, Defendant shall (i)

determine whether each hazardous waste container is subject to Level 1 or Level 2 controls

depending on the design capacity of the container and whether the container is or is not in light-

material service, in accordance with 40 C.F.R. § 264.1086(a)-(b), and (ii) control air emissions

from containers to the applicable Level 1 or Level 2 standards, as defined in 40 C.F.R. §

264.1086(c)-(d).

41.     _Denison Product Tank Emissions_. Defendant shall vent all Denison Product Tank

emission streams through a Vapor Balancing System during tank loading and unloading.

Transport vehicles must have a current certification in accordance with the United States

Department of Transportation (U.S. DOT) pressure test requirements of 49 CFR part 180 for

cargo tanks and 49 CFR 173.31 for tank cars. Organic liquids must only be unloaded from

transport vehicles when the Vapor Balancing System connecting the storage tank to the transport

vehicle is in operation.  No pressure relief valve on the storage tank or transport vehicle shall

open during loading or unloading or as a result of breathing losses.  Pressure relief valves on the

Denison Product Tanks must be set to no less than the set points established during the

engineering evaluation performed pursuant to Paragraph 37.c at all times to prevent breathing

losses.

### 6.  Sump Closure Plan

42.     Defendant shall complete and certify closure of the LUWA Collection Sump as follows:

a.     Defendant has submitted a written Closure Plan for the LUWA Collection Sump to the Director of the Ohio Environmental Protection Agency ("Ohio EPA"), in accordance with OAC 3745-55-12.  In doing so, Defendant advised Ohio EPA of this Consent Decree and stated that Defendant will proceed with the Closure Plan as submitted unless Ohio EPA provides comments within 60 days of submission.  Defendant shall maintain a copy of this plan, and all subsequent revisions, at Denison until closure is completed.

b.     Defendant shall allow 60 days from submission of the Closure Plan for Ohio EPA to provide any comments.  Within 30 days after the expiration of the 60-day period in the prior sentence, Defendant shall execute the Closure Plan in accordance with OAC 3745-55-97 and any comments received from Ohio EPA.

c.     Defendant shall submit to EPA all documentation (i) submitted to Ohio EPA certifying that closure was completed according to the Closure Plan, and (ii) received from Ohio EPA confirming that closure was completed according to the Closure Plan.  Defendant shall submit the documents required to be submitted to EPA by this Paragraph within 30 days of its submission of documents to Ohio EPA or its receipt of documents from Ohio EPA, as applicable.

**7.  Permitting Requirements**

43.    <u>Applicable Requirements for Permitting</u>. Before seeking to terminate the Consent Decree, pursuant to Section XVIII, Defendant shall submit to permitting authorities in the State of Ohio complete applications, amendments and/or supplements to incorporate as "applicable requirements" the following limits and standards into Title I, non-expiring, federally enforceable permits to be made permanent:

a.    The requirement to limit annual HAP emissions from the Facility to below 10 tpy for a single HAP and 25 tpy of combined HAPs including to quantify those emissions and maintain records of all calculations, as required by Paragraph 13 and this Subparagraph a. The proposed permit requirements shall include both emissions limits and an annual quantification requirement, as described below:

(1)    <u>Technically Accurate Emissions Limits</u>.

(a)    Defendant shall establish and submit technically accurate limits for (i) each discrete point HAP emission source, including but not limited to the two thin film evaporation units and the loading racks; and (ii) each fugitive HAP emission source, including but not limited to those defined as Covered Equipment and Tank Equipment and wastewater that contains HAPs, estimated at the point of generation.

(b)    Each limit must specify (i) the time period for the limitation (hourly, daily, monthly, annually) and (ii) the method (e.g. stack test, continuous emissions monitoring, engineering assessment, equations, emission factors, etc.) to determine compliance. For fugitive sources this method must be the 1995 Protocol for Equipment Leak Emission Estimates for Fugitive Sources (EPA-453/R-95-017) or any document designated by EPA as the successor to the 1995 protocol; and

(2)    <u>Annual Emissions Calculation</u>.  Defendant shall quantify and record its emissions at the end of each calendar year. The calculation shall include (i) emissions from each HAP emission source, including any deviations from a control device, process

28

upsets, or other HAP emissions events; and (ii) total emissions for the Facility for each single HAP emitted and for combined HAPs.

b.      The requirement to comply with the Denison Control System and Jennings Control System, as defined in Paragraph 7, achieving 95 percent control efficiency (Denison) and 90 percent control efficiency (Jennings) of total organic compounds and HAPs, as required by Paragraphs 14 and 15;

c.      The requirement to maintain and continuously operate Flow Indicators, as required by Paragraph 19;

d.      The requirement to maintain and continuously operate continuous parameter monitoring systems to measure and record the daily average temperature of the exhaust gases, as required by Paragraph 20;

e.      The requirement to vent emission streams from thin film evaporation units, loading racks, and all Facility waste and product tanks through a Closed Vent System, as required by Paragraph 21;

f.      The requirement to conduct LDAR monitoring, as required by Paragraph 24.a-24.c;

g.      The requirement to conduct inspections, monitoring, and maintenance/repairs on the Tank Equipment, as required by Paragraph 39; and

h.      The requirement to control emissions from containers and Denison Product Tanks, as required by Paragraphs 40 and 41.

**B.**     **Water Requirements**

**1.   Early Action Projects**

44.     <u>Jennings Discharges</u>.  Within 45 days of the Effective Date, Defendant shall:

a.      Install a sewer structure in the sewer lateral from Jennings (as replaced or rehabilitated pursuant to Paragraph 45) before it connects to the Collection System under Old Denison Road. The sewer structure shall accommodate the direct monitoring and control of the discharge from the lateral line to the Collection System at this location. Defendant shall submit all monitoring results from the sewer structure, or a statement that no discharge occurred, as part of each Annual Report required by Paragraph 67.

b.      Replace the control valve at the truck dock sump at Jennings. The valve shall be water tight, meet the AWWA C509-09 or an equivalent performance standard, and be made of materials compatible with wastewaters managed by Defendant. Within 60 days of the Effective Date, Defendant shall submit to EPA a manufacturer's product sheet for the valve or the results of an in-situ pressure test to show that the valve meets the specific pressure rating.

45.     <u>Sewer Rehabilitation</u>.  Within 45 days of the Effective Date, Defendant shall rehabilitate or replace the sewer lateral from Jennings to the Collection System. The work shall result in a sewer leakage or exfiltration rate of less than 100 gallons per inch of pipe diameter per mile per day at a minimum positive head of 2 feet. The new or rehabilitated equipment shall be tested via closed circuit television (video) inspection to verify that no infiltration or exfiltration occurs. Defendant shall perform the video inspection when a representative from NEORSD is able to observe the inspection and shall provide a copy of the video to NEORSD at the conclusion of the inspection. If Defendant chooses to replace the sewer lateral, it shall connect

the new lateral to the Collection System, cease all discharge to the existing lateral, and install a watertight seal so that no flow can enter the old lateral.

46.     Sewer Atmospheric Monitoring.  Within 75 days of the Effective Date, Defendant shall submit for EPA review and approval a Monitoring Work Plan to monitor the atmospheric conditions and pollutants inside the Jennings lateral that meets the requirements in Appendix A to this Decree.

47.     Within 30 days of EPA final approval of the Monitoring Work Plan, CSI shall install, operate, and maintain the monitoring devices(s) in accordance with the final approved plan.

48.     Denison Lateral Elimination.  Within 15 days of the Effective Date, Defendant shall cease all discharges from Denison to the Collection System, including discharges at the location referred to as Discharge Point 03 in the NEORSD Administrative Order No. CSID-S-SIU-17R and located between the CSX railroad tracks and the CSI fence along the north side of the Denison Facility. Elimination here shall mean the installation of a watertight seal at a location prior to Discharge Point 03, so that no discharge can occur from the pipe into the Collection System.

49.     Wastewater Disposal.  Within 30 days of the Effective Date, Defendant shall begin documenting and reporting the disposal method and monthly volume of all wastewater at the Facility.  The monthly summaries shall be reported per the requirements in Section VII of this CD.  The sources of wastewater include:

        a.      Any wastewater associated with or contained in the LUWA Collection Sump;

        b.      Any storm water, snowmelt, or other wastewater that accumulates in and/or

around tank farms, diked areas, containment pads, or any other similar exterior containment structures;

        c.    Any other sources of wastewater that can include, but are not limited to, tote washing wastewater, floor washing wastewater, production and blending area wastewater, equipment cleaning wastewater, spill cleanup, and laboratory wastewater.

### 2. Piping Audit

50.    Defendant shall conduct a piping audit of the Facility in accordance with industry standards and best management practices.  The goals of the audit shall be to develop a complete and accurate map(s) of piping that conducts or could conduct wastewater, storm water, and/or non-contact cooling water within the Facility, and to identify sources of wastewater and any potential locations for unauthorized discharges of process wastewater or non-contact cooling water to the Collection System or the environment, including cross-connections between wastewater and non-contact cooling water and other piping or valve arrangements that could lead to unauthorized discharges.  The audit shall include an evaluation of measures taken by Defendant to prevent unintended discharges and shall include recommendations for alarms, fail-safes, and operation and maintenance procedures to prevent unintended discharges from occurring because of human error. The piping audit shall be conducted using appropriate industry-standard best practices for locating underground utilities including video verification, visual inspections, dye testing, and review of as-built and historical drawings.  The piping audit shall address all above-ground and below-ground piping at the Facility, including:

- all piping used to convey wastewater to the Collection System;

- all piping used to convey non-contact cooling water; and

- a delineation of all areas where the Facility contributes storm water to the Collection System.

51.     Within 15 days of the Effective Date, Defendant shall notify EPA of the name of an independent third-party, who is a professional engineer ("PE"), who will either design the piping audit and evaluate the results, or subcontract to another qualified, independent company that will design and perform the audit subject to review and approval by the PE.

52.     Within 90 days of the Effective Date, Defendant shall complete the piping audit.

53.     Within 15 days of completion of the piping audit, Defendant shall submit to EPA accurate "Record Drawings" of impoundments, ponds, pumps, piping, and valves at the Facility. The Record Drawings shall be completed by a professional engineer or professional land surveyor.

54.     Within 60 days of completion of the piping audit, Defendant shall submit a report ("Piping Audit Report"), certified by the PE, of its findings to EPA for review.  The Piping Audit Report shall include:

a.      a diagram of all piping and connections inspected and located, including a description of the inspection technique;

b.      updated Process and Instrumentation Diagrams ("P&ID") showing all wastewater, non-contact cooling water lines, and storm water connections, valves, pumps, control devices, and other appurtenances;

c.      an updated map showing the locations of all wastewater and non-contact cooling water pipes.  The map shall include the size, invert and rim elevations, material and direction of flow for all above and below ground pipes used for wastewater, non-contact cooling water, and storm water;

d.      a copy of any piping video with a vocal narrative identifying the piping and connections, location, piping and connection condition, cross connections, and other

33

observations;

e.     documentation of any valves or other equipment that Defendant has installed to prevent the discharge of wastewater, noncontact cooling water, and storm water; and

f.     a proposal (including implementation and completion schedule(s)) for any additional modifications of its piping as necessary to eliminate any piping that poses a hazard for unauthorized discharge, bypass, or overflow.  Upon approval by EPA, Defendant shall implement the proposal according to the approved schedule(s).  Defendant is not prohibited from taking immediate interim measures to prevent unauthorized discharges during EPA review.

55.     Within 15 days of the completion of any modifications to the wastewater system during the life of this Decree, CSI shall submit to EPA updated Record Drawings clearly indicating all piping changes.

**3. Baseline Report**

56.     Within 30 days of completion of the Piping Audit Report, an independent third-party consultant who is a professional engineer hired by Defendant shall submit a Baseline Report, which contains the following information:

a.     Description of nature, average rate of production, and Standard Industrial Classification of the operation(s) carried out by Defendant at Jennings and Denison.  The description shall include a schematic process diagram which indicates points of discharge to the POTW from the regulated processes.

b.     Information showing the measured average daily and maximum daily flow, in gallons per day, to the POTW from each of the following:

(1)     process wastewater streams;

(2)     non-contact cooling water; and

(3)     storm water.

    c.      Results of sampling and analysis identifying the nature and concentration of regulated pollutants in the discharge to the POTW from each discharge listed above.

    (1)      A minimum of four representative samples from each discharge shall be taken.

    (2)      Samples shall be at a point representative of the discharges to the POTW.

    d.      The report shall indicate the time, date, and place of sampling, and methods of analysis, and shall certify that such sampling and analysis is representative of normal work cycles and expected pollutant discharges to the POTW.

57.      The report shall be submitted concurrently to Defendant and EPA.

58.      <u>Compliance Plan</u>.  Within 30 days of the submission of the Baseline Report, Defendant shall submit a written Compliance Plan to EPA for review and approval for controlling and monitoring all wastewater discharges to the POTW within a certain timeframe. The Compliance Plan must include a means of storing non-domestic wastewater until it can be tested, and if necessary treated, prior to discharging to the POTW.  The Compliance Plan shall also include a means of estimating flow and pollutant loading from wastewater discharges.

### 4. Storm Water Pollution Prevention Plan

59.      Within 30 days of the Effective Date, Defendant shall update its Storm Water Pollution Prevention Plan and submit it to EPA for review and approval. The updated plan shall include all areas at the Facility with storm water runoff from industrial materials and industrial processes, all monitoring and inspection requirements, and all control measures required by the General NPDES Permit OHR000006.

C.        **Approval of Deliverables**

60.        After review of any plan, report, or other item that is required to be submitted for approval pursuant to this Consent Decree, EPA shall in writing: (a) approve the submission; (b) approve the submission upon specified conditions; (c) approve part of the submission and disapprove the remainder; or (d) disapprove the submission.

61.        If the submission is approved pursuant to Paragraph 60, Defendant shall take all actions required by the plan, report, or other document, in accordance with the schedules and requirements of the plan, report, or other document, as approved.  If the submission is conditionally approved or approved only in part pursuant to Paragraph 60(b) or (c), Defendant shall, upon written direction from EPA, take all actions required by the approved portions of the plan, report, or other item that EPA determines are technically severable from any disapproved portions, subject to Defendant's right to dispute only the specified conditions or the disapproved portions, under Section X (Dispute Resolution).

62.        If the submission is disapproved in whole or in part pursuant to Paragraph 60(c) or (d), Defendant shall, within 30 days or such other time as the Parties agree to in writing, correct all deficiencies and resubmit the plan, report, or other item, or disapproved portion thereof, for approval, in accordance with the preceding Paragraphs.  If the resubmission is approved in whole or in part, Defendant shall proceed in accordance with the preceding Paragraph.

63.        If a resubmitted plan, report, or other item, or portion thereof, is disapproved in whole or in part, EPA may again require Defendant to correct any deficiencies, in accordance with the preceding Paragraphs, or may itself correct any deficiencies, subject to Defendant's

right to invoke Dispute Resolution and the right of EPA to seek stipulated penalties as provided in the preceding Paragraphs.

64.     Any stipulated penalties applicable to the original submission, as provided in Section VIII, shall accrue during the 30 day period or other specified period, but shall not be payable unless the resubmission is untimely or is disapproved in whole or in part; provided that, if the original submission was so deficient as to constitute a material breach of Defendant's obligations under this Decree, the stipulated penalties applicable to the original submission shall be due and payable notwithstanding any subsequent resubmission.

65.     Permits.  Where any compliance obligation under this Section requires Defendant to obtain a federal, state, or local permit or approval, Defendant shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals. Defendant may seek relief under the provisions of Section IX (Force Majeure) for any delay in the performance of any such obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if Defendant has submitted timely and complete applications and has taken all other actions necessary to obtain all such permits or approvals.

## VI.     26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION

66.     For purposes of the identification requirement of Section 162(f)(2)(A)(ii) of the Internal Revenue Code, 26 U.S.C. § 162(f)(2)(A)(ii), performance of Paragraph 5 of Section II (Applicability); Paragraphs 12-59, 61, and 65 of Section V (Compliance Requirements) and related Appendix A; Paragraphs 67 and 69-70 of Section VII (Reporting Requirements); and Paragraphs 98-101 of Section XI (Information Collection and Retention); is restitution or required to come into compliance with law.

## VII.    REPORTING REQUIREMENTS

67.    <u>Annual Reports</u>.

a.    By January 31st of each year after the lodging of this Consent Decree, until termination of this Decree pursuant to Section XVIII, Defendant shall submit to EPA an annual report for the preceding twelve months that describes all actions taken to comply with the Consent Decree during the reporting period and all actions planned to be taken in the next twelve months. The reports shall include:

(1)    Reports on atmospheric conditions as detailed in the sewer atmospheric monitoring work plan;

(2)    Monthly total volume and disposal method for the sources of wastewater listed in Paragraph 49;

(3)    HAP emissions calculations required by Paragraph 43.a;

(4)    The number of LDAR Personnel at the Facility and the approximate percentage of time each such person dedicated to performing his/her LDAR functions;

(5)    Any deviations identified in the LDAR QA/QC performed under Paragraph 27, as well as any corrective actions taken under that Subsection;

(6)    A summary of LDAR audit results including specifically identifying all alleged deficiencies;

(7)    The status of all actions under any LDAR CAP that was submitted during the reporting period, unless the CAP was submitted less than one month before the compliance status report;

(8)    Purchase orders for each seal purchased and installed for each tank pursuant to Paragraph 36;

(9)    Documentation for all reports required by Paragraph 37.d and the results of the engineering evaluation required by Paragraphs 37.b and 37.c;

(10)    A spreadsheet of all records required by Paragraph 39;

b.    The annual report shall also include a description of any non-compliance with the requirements of this Consent Decree. If Defendant violates, or has reason to believe that it may violate, any requirement of this Consent Decree, Defendant shall notify the United States

of such violation and its likely duration in the report after Defendant first became aware of the violation, with an explanation of the violation's likely cause and of the remedial steps taken, or to be taken, to prevent or minimize such violation. If the cause of a violation cannot be fully explained at the time the report is due, Defendant shall so state in the report. Defendant shall investigate the cause of the violation and shall then submit an amendment to the report, including a full explanation of the cause of the violation, within 30 Days of the day Defendant becomes aware of the cause of the violation. Nothing in this Paragraph or the following Paragraph relieves Defendant of its obligation to provide the notice required by Section IX (Force Majeure).

68.     Whenever any violation of this Consent Decree or of any applicable permits, including any Administrative Orders or permits issued by NEORSD, or any other event affecting Defendant's performance under this Decree, or the performance of its Facility, may pose an immediate threat to the public health or welfare or the environment, Defendant shall notify EPA orally or by email as soon as possible, but no later than 24 hours after Defendant first knew of the violation or event. If the violation or other event involves any material entering the Collection System, Defendant shall also notify NEORSD at the same time it notifies EPA. This procedure is in addition to the requirements set forth in the preceding Paragraph.

69.     All reports shall be submitted to the persons designated in Section XIV (Notices).

70.     Each report submitted by Defendant under this Section shall be signed by an official of the submitting party and include the following certification:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted.  Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete.  I have no personal knowledge that the information submitted is other than true, accurate, and complete.  I am aware that there are significant

penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

71. This certification requirement does not apply to emergency or similar notifications where compliance would be impractical.

72. The reporting requirements of this Consent Decree do not relieve Defendant of any reporting obligations required by the CAA, CWA, or RCRA, or their implementing regulations, or by any other federal, state, or local law, regulation, permit, administrative order, or other requirement.

73. Any information provided pursuant to this Consent Decree may be used by the United States in any proceeding to enforce the provisions of this Consent Decree and as otherwise permitted by law.

## VIII.   STIPULATED PENALTIES

74. Defendant shall be liable for stipulated penalties to the United States for violations of this Consent Decree as specified below, unless excused under Section IX (Force Majeure).  A violation includes failing to perform any obligation required by the terms of this Decree, including any work plan or schedule approved under this Decree, according to all applicable requirements of this Decree and within the specified time schedules established by or approved under this Decree.

75. <u>Late Payment of Civil Penalty</u>.  If Defendant fails to pay the civil penalty required to be paid under Section IV (Civil Penalty) when due, Defendant shall pay a stipulated penalty of $1500 per day for each day that the payment is late.

76. <u>Failure to Meet Other Consent Decree Obligations</u>. Defendant shall be liable for stipulated penalties to the United States for violations of this Consent Decree as specified in Table 1 and Table 2 below unless excused under Section IX (Force Majeure). For any violation

of the Decree not specified below, Defendant shall be liable for a stipulated penalty of $250 per

day.

**Table 1: Air and RCRA Stipulated Penalties**

| Paragraph Number | Violation | Stipulated Penalty |
|---|---|---|
| 76.a | Each failure to comply with any applicable standard in 40 C.F.R. Part 264, Subparts AA, BB, and CC, in violation of Paragraph 12 -- except that any failure identified in the first LDAR audit report prepared in compliance with Paragraphs 29-31, and corrected pursuant to Paragraph 34, shall not be a basis for a stipulated penalty under this Subparagraph. | $ 500 per violation per day |
| 76.b | Missed deadlines (relevant Paragraph in parenthesis). Failure to: timely submit annual air emissions calculation (67.a); timely develop or annually update (if needed) Facility LDAR Plan (23); conduct LDAR audit (29); submit a Corrective Action Plan (34); implement a corrective action (34); submit a certification of completion (35); conduct Tank Evaluation (37.a-37.c); submit Tank Evaluation Report (37.d); implement tank modifications (38); conduct monitoring of Tank Equipment (39.a); conduct repairs of Tank Equipment (39.b). | Penalty per day of non-compliance<br><br>1 - 15 days $ 100<br>16 - 30 days $ 150<br>31 days or more $ 200<br><br>Not to exceed $20,000 per audit per Paragraph for violations of Paragraph 29, 34, 35.<br><br>Not to exceed $20,000 per Paragraph for violations of Paragraph 13, 37, 37.d, 38, or 39.a. |
| 76.c | Improper audits and evaluations (relevant Paragraph in parenthesis). Failure to: conduct annual air emissions calculation (43.a); comply with LDAR audit requirements (31); comply with Comparative Monitoring requirements (32); comply with the Tank Evaluation requirements (37); conduct engineering evaluation (39.d). | $10,000 per violation per audit or evaluation |

| 76.d | Failure to route emissions through a Closed Vent System in accordance with Paragraph 21. | $500 per violation per day |
|------|------|------|
| 76.e | Failure to conduct monitoring as required by Paragraph 24. | $100 per component per missed monitoring, not to exceed $2,500 per month |
| 76.f | Each failure of a monitoring technician to complete the certification required in Paragraph 26. | $50 per failure per technician |
| 76.g | Each failure to perform any of the requirements relating to QA/QC in Paragraph 27. | $500 per missed requirement per quarter |
| 76.h | Failure to install high-performance gasket/seal as required in Paragraph 36. | $200 per seal per day, not to exceed $5,000 per seal |
| 76.j | Failure to maintain records of Tank Equipment inspections and preventative maintenance as required by Paragraph 39.c. | $250 per day |
| 76.k | Failure to control emissions from containers in accordance with Paragraph 40 and 41. | $500 per violation per day |
| 76.l | Failure to complete and certify closure of the LUWA Collection Sump as required by Paragraph 42.a, 42.b, and 42.c. | Penalty per day of non-compliance<br><br>1 - 30 days $ 500<br>31 - 60 days $ 750<br>61 days or more $ 1,000 |
| 76.m | Failure to submit a Title I, non-expiring, federally enforceable permit application in accordance with the requirements of Paragraph 43. | Penalty per day of non-compliance<br><br>1 - 15 days $ 250<br>16 - 30 days $ 375<br>31 days or more $ 500 |

**Table 2: Water Stipulated Penalties**

| Paragraph Number | Violation | Stipulated Penalties |
|---|---|---|
| 76.n | Failure to timely submit any required deliverables, including, designs, notices, plans, permit renewal applications, reports, and a final SWPPP as set forth in Paragraphs 44 through 59. | Penalty per day of non-compliance<br><br>1 - 15 days $ 500<br>16 - 30 days $ 1,000<br>31 days or more $ 2,000 |
| 76.o | Failure to implement any assessment, study, or program pursuant to the associated plan as approved by EPA and/or pursuant to the requirements set forth in Paragraphs 44 through 59. | Penalty per day of non-compliance<br><br>1 - 15 days $ 1,500<br>16 - 30 days $ 3,000<br>31 days or more $ 5,000 |
| 76.p | Failure to comply with the terms and conditions of the NEORSD Administrative Order No. CSIJ-S-SIU-17,  Order No.  CSID-S-SIU-17R, and any successor NEORSD Administrative Orders. | $3,000 for each violation of maximum concentration limit |

77.     Stipulated penalties under this Section shall begin to accrue on the day after performance is due or on the day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases.  Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

78.     Defendant shall pay any stipulated penalty within 30 Days of receiving the United States' written demand.

79.      The United States may, in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due it under this Consent Decree.

80.     Stipulated penalties shall continue to accrue as provided in Paragraph 76, during any Dispute Resolution, but need not be paid until the following:

a.      If the dispute is resolved by agreement of the Parties or by a decision of EPA that is not appealed to the Court, Defendant shall pay accrued penalties determined to be

43

owing, together with interest, to the United States within 30 Days of the effective date of the agreement or the receipt of EPA's decision or order.

   b. If the dispute is appealed to the Court and the United States prevails in whole or in part, Defendant shall pay all accrued penalties determined by the Court to be owing, together with interest, within 60 Days of receiving the Court's decision or order, except as provided in Subparagraph c, below.

   c. If any Party appeals the District Court's decision, Defendant shall pay all accrued penalties determined to be owing, together with interest, within 15 Days of receiving the final appellate court decision.

  81. Defendant shall pay stipulated penalties owing to the United States in the manner set forth and with the confirmation notices required by Paragraphs 9 and 10, except that the transmittal letter shall state that the payment is for stipulated penalties and shall state for which violation(s) the penalties are being paid.

  82. If Defendant fails to pay stipulated penalties according to the terms of this Consent Decree, Defendant shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due.  Nothing in this Paragraph shall be construed to limit the United States from seeking any remedy otherwise provided by law for Defendant's failure to pay any stipulated penalties.

  83. The payment of penalties and interest, if any, shall not alter in any way Defendant's obligation to complete the performance of the requirements of this Consent Decree.

  84. <u>Non-Exclusivity of Remedy</u>.  Stipulated penalties are not the exclusive remedy for violations of this Consent Decree.  Subject to the provisions of Section XII (Effect of Settlement/Reservation of Rights), the United States expressly reserves the right to seek any

other relief it deems appropriate for Defendant's violation of this Decree or applicable law, including but not limited to an action against Defendant for statutory penalties, additional injunctive relief, mitigation, or offset measures.  However, the amount of any statutory penalty assessed for a violation of this Consent Decree shall be reduced by an amount equal to the amount of any stipulated penalty assessed and paid pursuant to this Consent Decree.

## IX.     FORCE MAJEURE

85.     "Force majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Defendant, of any entity controlled by Defendant, or of Defendant's contractors, that delays or prevents the performance of any obligation under this Consent Decree despite Defendant's best efforts to fulfill the obligation.  The requirement that Defendant exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure event and best efforts to address the effects of any potential force majeure event (a) as it is occurring and (b) following the potential force majeure, such that the delay and any adverse effects of the delay are minimized.  "Force Majeure" does not include Defendant's financial inability to perform any obligation under this Consent Decree.

86.     If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a force majeure event, Defendant shall provide notice orally or by email to EPA, within 72 hours of when Defendant first knew that the event might cause a delay.  Within seven days thereafter, Defendant shall provide in writing to EPA an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Defendant's rationale for attributing such delay to a force majeure event if it

intends to assert such a claim; and a statement as to whether, in the opinion of Defendant, such event may cause or contribute to an endangerment to public health, welfare, or the environment. Defendant shall include with any notice all available documentation supporting the claim that the delay was attributable to a force majeure.  Failure to comply with the above requirements shall preclude Defendant from asserting any claim of force majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure.  Defendant shall be deemed to know of any circumstance of which Defendant, any entity controlled by Defendant, or Defendant's contractors knew or should have known.

87.     If EPA agrees that the delay or anticipated delay is attributable to a force majeure event, the time for performance of the obligations under this Consent Decree that are affected by the force majeure event will be extended by EPA for such time as is necessary to complete those obligations.  An extension of the time for performance of the obligations affected by the force majeure event shall not, of itself, extend the time for performance of any other obligation.  EPA will notify Defendant in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure event.

88.     If EPA does not agree that the delay or anticipated delay has been or will be caused by a force majeure event, EPA will notify Defendant in writing of its decision.

89.     If Defendant elects to invoke the dispute resolution procedures set forth in Section X (Dispute Resolution), it shall do so no later than 15 days after receipt of EPA's notice. In any such proceeding, Defendant shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and

that Defendant complied with the requirements of Paragraphs 85 and 86. If Defendant carries this burden, the delay at issue shall be deemed not to be a violation by Defendant of the affected obligation of this Consent Decree identified to EPA and the Court.

## X. DISPUTE RESOLUTION

90. Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree. Defendant's failure to seek resolution of a dispute under this Section shall preclude Defendant from raising any such issue as a defense to an action by the United States to enforce any obligation of Defendant arising under this Decree.

91. <u>Informal Dispute Resolution</u>. Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when Defendant sends the United States a written Notice of Dispute. Such Notice of Dispute shall state clearly the matter in dispute. The period of informal negotiations shall not exceed 20 Days from the date the dispute arises, unless that period is modified by written agreement. If the Parties cannot resolve a dispute by informal negotiations, then the position advanced by the United States shall be considered binding unless, within 20 Days after the conclusion of the informal negotiation period, Defendant invokes formal dispute resolution procedures as set forth below.

92. <u>Formal Dispute Resolution</u>. Defendant shall invoke formal dispute resolution procedures, within the time period provided in the preceding Paragraph, by serving on the United States a written Statement of Position regarding the matter in dispute. The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting Defendant's position and any supporting documentation relied upon by Defendant.

47

93.     The United States shall serve its Statement of Position within 45 Days of receipt of Defendant's Statement of Position.  The United States' Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the United States.  The United States' Statement of Position shall be binding on Defendant, unless Defendant files a motion for judicial review of the dispute in accordance with the following Paragraph.

94.     Defendant may seek judicial review of the dispute by filing with the Court and serving on the United States, in accordance with Section XIV (Notices), a motion requesting judicial resolution of the dispute.  The motion must be filed within 14 Days of receipt of the United States' Statement of Position pursuant to the preceding Paragraph.  The motion shall contain a written statement of Defendant's position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree.

95.     The United States shall respond to Defendant's motion within the time period allowed by the Local Rules of this Court.  Defendant may file a reply memorandum, to the extent permitted by the Local Rules.

96.     <u>Standard of Review</u>

a.      <u>Disputes Concerning Matters Accorded Record Review</u>.  Except as otherwise provided in this Consent Decree, in any dispute brought under Paragraph 92 pertaining to the adequacy or appropriateness of plans, procedures to implement plans, schedules, or any other items requiring approval by EPA under this Consent Decree; the adequacy of the performance of work undertaken pursuant to this Consent Decree; and all other disputes that are

accorded review on the administrative record under applicable principles of administrative law, Defendant shall have the burden of demonstrating, based on the administrative record, that the position of the United States is arbitrary and capricious or otherwise not in accordance with law.

        b.    <u>Other Disputes</u>.  Except as otherwise provided in this Consent Decree, in any other dispute brought under Paragraph 92, Defendant shall bear the burden of demonstrating that its position complies with this Consent Decree and better furthers the objectives of the Consent Decree.

        97.    The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Defendant under this Consent Decree, unless and until final resolution of the dispute so provides.  Stipulated penalties with respect to the disputed matter shall continue to accrue from the first day of noncompliance, but payment shall be stayed pending resolution of the dispute as provided in Paragraph 80.  If Defendant does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section VIII (Stipulated Penalties).

## XI.    INFORMATION COLLECTION AND RETENTION

        98.    The United States and its representatives, including attorneys, contractors, and consultants, shall have the right of entry into any facility covered by this Consent Decree, at all reasonable times, upon presentation of credentials, to:

        a.    monitor the progress of activities required under this Consent Decree;

        b.    verify any data or information submitted to the United States in accordance with the terms of this Consent Decree;

        c.    obtain samples and, upon request, splits of any samples taken by Defendant or its representatives, contractors, or consultants;

      d.     obtain documentary evidence, including photographs and similar data; and

      e.     assess Defendant's compliance with this Consent Decree.

99.     Upon request, Defendant shall provide EPA or its authorized representatives splits of any samples taken by Defendant.  Upon request, EPA shall provide Defendant splits of any samples taken by EPA.

100.     Until three years after the termination of this Consent Decree, Defendant shall retain, and shall instruct its contractors and agents to preserve, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in its or its contractors' or agents' possession or control, or that come into its or its contractors' or agents' possession or control, and that relate in any manner to Defendant's performance of its obligations under this Consent Decree.  This information-retention requirement shall apply regardless of any contrary corporate or institutional policies or procedures.  At any time during this information-retention period, upon request by the United States, Defendant shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

101.     At the conclusion of the information-retention period provided in the preceding Paragraph, Defendant shall notify the United States at least 90 Days prior to the destruction of any documents, records, or other information subject to the requirements of the preceding Paragraph and, upon request by the United States, Defendant shall deliver any such documents, records, or other information to EPA.  Defendant may assert that certain documents, records, or other information is privileged under the attorney-client privilege or any other privilege recognized by federal law.  If Defendant asserts such a privilege, it shall provide the following: (a) the title of the document, record, or information; (b) the date of the document, record, or

information; (c) the name and title of each author of the document, record, or information; (d) the name and title of each addressee and recipient; (e) a description of the subject of the document, record, or information; and (f) the privilege asserted by Defendant.  However, no documents, records, or other information created or generated pursuant to the requirements of this Consent Decree shall be withheld on grounds of privilege.

102.    Defendant may also assert that information required to be provided under this Section is protected as Confidential Business Information ("CBI") under 40 C.F.R. Part 2.  As to any information that Defendant seeks to protect as CBI, Defendant shall follow the procedures set forth in 40 C.F.R. Part 2.

103.    This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States pursuant to applicable federal, state, or local laws, regulations, administrative orders, or permits, nor does it limit or affect any duty or obligation of Defendant to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

## XII.    EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

104.    This Consent Decree resolves the civil claims of the United States for the Covered Violations through the date of lodging.

105.    The United States reserves all legal and equitable remedies available to enforce the provisions of this Consent Decree, except as expressly stated in Paragraph 104.  This Consent Decree shall not be construed to limit the rights of the United States to obtain penalties or injunctive relief under the CAA, CWA, RCRA, or their implementing regulations, or under other federal, state, or local laws, regulations, administrative orders, or permit conditions, except as expressly specified in Paragraph 104.  The United States further reserves all legal and equitable

remedies to address any imminent and substantial endangerment to the public health or welfare or the environment arising at, or posed by, Defendant's Facility, whether related to the violations addressed in this Consent Decree or otherwise.

106.     In any subsequent administrative or judicial proceeding initiated by the United States for injunctive relief, civil penalties, or other appropriate relief relating to the Facility, Defendant shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States in the subsequent proceeding were or should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraph 104.

107.     This Consent Decree is not a permit, administrative order, or a modification of any permit or administrative order, under any federal, State, or local laws or regulations. Defendant is responsible for achieving and maintaining complete compliance with all applicable federal, State, and local laws, regulations, administrative orders, and permits; Defendant's compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, administrative orders, or permits, except as set forth herein.  The United States does not, by its consent to the entry of this Consent Decree, warrant or aver in any manner that Defendant's compliance with any aspect of this Consent Decree will result in compliance with provisions of the Clean Air Act, Clean Water Act, or RCRA, or with any other provisions of federal, State, or local laws, regulations, administrative orders, or permits.

108.     This Consent Decree does not limit or affect the rights of Defendant or of the United States against any third parties, not party to this Consent Decree, nor does it limit the

rights of third parties, not party to this Consent Decree, against Defendant, except as otherwise provided by law.

109.    This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Consent Decree.

## XIII.   COSTS

110.    The Parties shall bear their own costs of this action, including attorneys' fees, except that the United States shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties due but not paid by Defendant.

## XIV.   NOTICES

111.     Unless otherwise specified in this Decree, whenever notifications, submissions, or communications are required by this Consent Decree, they shall be made in writing and addressed to the contacts listed below. Where a party includes an email address, sending by email satisfies the notice requirement.

| Party | Mail Address | Email Address |
|-------|-------------|---------------|
| **United States** | EES Case Management Unit<br>Environment & Natural Resources Division<br>U.S. Department of Justice<br>P.O. Box 7611<br>Washington, D.C.  20044-7611<br>Re: DJ # 90-7-1-11189 | eescdcopy.enrd@usdoj.gov<br>Re: DJ # 90-7-1-11189 |
| **EPA**<br><br>**(to all three**<br><br>**rows)** |  | r5ardreporting@epa.gov |
|  | Mardi Klevs<br>Chief, Land and Chemicals Enforcement<br>and Compliance Assurance Branch<br>Enforcement & Compliance Assurance Div.<br>U.S. EPA, Region 5<br>77 West Jackson Blvd.<br>Chicago, IL 60604 |  |
|  | Chief, Water Enforcement and Compliance<br>Assurance Branch<br>Enforcement & Compliance Assurance Div.<br>U.S. EPA, Region 5<br>77 West Jackson Blvd.<br>Chicago, IL 60604 | r5weca@epa.gov<br><br>(as a text searchable .pdf) |
| **NEORSD** | Scott Broski<br>Superintendent of Environmental Services<br>4747 East 49th Street<br>Cuyahoga Heights, OH 44125 |  |
| **City of Cleveland** | Rachid Zoghaib<br>12302 Kirby Ave.<br>Cleveland, OH 44108 | rzoghaib@ClevelandWPC.com |
| **Defendant** | Jerry Schill<br>3751 Jennings Rd.<br>Cleveland, Ohio 44109 | jschill@chemicalsolvents.com |

112.	Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

113.	Notices submitted pursuant to this Section shall be deemed submitted upon mailing, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XV.	EFFECTIVE DATE

114.	The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

## XVI.	RETENTION OF JURISDICTION

115.	The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of resolving disputes arising under this Decree or entering orders modifying this Decree, pursuant to Sections X and XVII, or effectuating or enforcing compliance with the terms of this Decree.

## XVII.	MODIFICATION

116.	The terms of this Consent Decree, including the attached appendix, may be modified only by a subsequent written agreement signed by all the Parties.  Where the modification constitutes a material change to this Decree, it shall be effective only upon approval by the Court.

117.	Any disputes concerning modification of this Decree shall be resolved pursuant to Section X (Dispute Resolution), provided, however, that, instead of the burden of proof provided

by Paragraph 96, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XVIII. TERMINATION

118.    After Defendant has completed the requirements of Section V (Compliance Requirements), has thereafter maintained continuous satisfactory compliance with this Consent Decree for a period of one year, is in compliance with its permits and administrative orders and has obtained all air permit(s) as required by Paragraph 43, has complied with all other requirements of this Consent Decree, and has paid the civil penalty and any accrued stipulated penalties as required by this Consent Decree, Defendant may serve upon the United States a Request for Termination, stating that Defendant has satisfied those requirements, together with all necessary supporting documentation.

119.    Following receipt by the United States of Defendant's Request for Termination, the Parties shall confer informally concerning the Request and any disagreement that the Parties may have as to whether Defendant has satisfactorily complied with the requirements for termination of this Consent Decree.  If the United States agrees that the Decree may be terminated, the Parties shall submit, for the Court's approval, a joint stipulation terminating the Decree.

120.    If the United States does not agree that the Decree may be terminated, Defendant may invoke Dispute Resolution under Section X.  However, Defendant shall not seek Dispute Resolution of any dispute regarding termination until 90 days after service of its Request for Termination.

## XIX.   PUBLIC PARTICIPATION

121.    This Consent Decree shall be lodged with the Court for a period of not less than 30 Days for public notice and comment in accordance with 28 C.F.R. § 50.7.  The United States reserves the right to withdraw or withhold its consent if the comments regarding the Consent Decree disclose facts or considerations indicating that the Consent Decree is inappropriate, improper, or inadequate. Defendant consents to entry of this Consent Decree without further notice and agrees not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of the Decree, unless the United States has notified Defendant in writing that it no longer supports entry of the Decree.

## XX.   SIGNATORIES/SERVICE

122.    The undersigned representative of Defendant and the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice (or his or her designee) each certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

123.    This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis.  Defendant agrees to accept service of process by mail or email with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons. Defendant need not file an answer to the Complaint in this action unless or until the Court expressly declines to enter this Consent Decree.

## XXI.   INTEGRATION

124.    This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein. The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Consent Decree.

## XXII.  FINAL JUDGMENT

125.    Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the United States and Defendant.

## XXIII. APPENDIX

126.    The following Appendix is attached to and part of this Consent Decree:

"Appendix A" is the Sewer Atmospheric Monitoring requirements.


Dated and entered this ____ day of _____, 20____


_____
UNITED STATES DISTRICT JUDGE

*Signature page for Consent Decree in United States, et al. v. Chemical Solvents*

**FOR THE UNITED STATES OF AMERICA:**

Sept. 11, 2019
Date

KAREN S. DWORKIN
Deputy Section Chief
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice

THOMAS A. BENSON
ANNA E. CROSS
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
Washington, DC  20044-7611

JUSTIN E. HERDMAN
United States Attorney
Northern District of Ohio

STEVEN J. PAFFILAS
Assistant United States Attorney
Northern District of Ohio
801 West Superior Avenue; Suite 400
Cleveland, OH  44113

*Signature page for Consent Decree in United States, et al. v. Chemical Solvents*

**FOR THE U.S. ENVIRONMENTAL PROTECTION AGENCY:**

T. LEVERETT NELSON
Regional Counsel
U.S. Environmental Protection Agency, Region 5

JOSH ZAHAROFF
Associate Regional Counsel
U.S. Environmental Protection Agency, Region 5
Office of Regional Counsel

60



*Signature page for Consent Decree in United States, et al. v. Chemical Solvents*

**FOR CHEMICAL SOLVENTS, INC.:**

8-9-19

Date

Name *Jerry Schill*

Title *V.P.*

Address 3751 JENNINGS RD
CLEVELAND, Ohio
44109

61

**APPENDIX A**

**SEWER ATMOSPHERIC MONITORING**

1.      Within 75 days of the Effective Date of the Consent Decree, CSI shall submit for EPA review and approval a Monitoring Work Plan to monitor the atmospheric conditions and pollutants inside the sewer line that receives wastewater discharges from the CSI facility at Jennings that meets the requirements below.

2.      Within 30 days of EPA approval of the Monitoring Work Plan, CSI shall install, operate, and maintain the monitoring device(s) in accordance with the final approved plan.

3.      <u>Monitoring Location</u>. The monitoring location shall be a manhole located within the sewer structure required by Paragraph 44.a of the Consent Decree.

4.      <u>Types of Monitoring</u>.  Defendant will perform two types of monitoring:

   a.      Continuous monitoring, with continuous data logging, for the following parameters:

      i.      the percentage of the lower explosive limit (LEL) in the atmosphere;

      ii.      the concentration of total volatile organic compounds (VOCs) in the atmosphere in the parts per million sensitivity range; and

      iii.      the temperature ($^{o}$C) of the water flowing in the sewer;

   b.      Monthly sampling for Total VOCs

      i.      Ambient grab water samples must be collected and analyzed for Total VOCs; and

      ii.      Ambient air sampling for Total VOCs

1

5.      <u>Quality Assurance</u>.  The Monitoring Work Plan shall include a Quality Assurance Project Plan (QAPP) consistent with "EPA Requirements for Quality Assurance Project Plans," EPA/240/B-01/003, March 2001.  Elements of the QAPP shall include, but not be limited to:

a.      Continuous monitoring:

i.      A description of the device or devices, including make, model, and the device's sensitivity, that CSI will use to conduct continuous monitoring.

ii.      The manner in which the device(s) will be installed at each location to obtain measurements of the LEL, VOCs, and temperature.

iii.      Procedures and schedules for calibrating and maintaining the monitoring devices and all other related equipment consistent with any manufacturers' recommendations.

iv.      A description of how CSI will collect continuous measurements from the device(s) and how and where the data will be recorded and preserved.

b.      Air and wastewater sampling:

i.      A description of the devices and equipment used to collect grab samples of air and wastewater within the sewer.

1.      Air sample canisters and equipment shall be capable of collecting grab samples representative of the atmosphere in the previously identified sewer manholes.

2.      Water sampling bottles and equipment shall be capable of collecting grab samples representative of the wastewater flow from the lower most pipe invert with wastewater flow.

3.      The canisters and bottles used for sample collection shall be appropriate for collecting samples for the analysis under the methods listed in Paragraph 4 of this Appendix.

ii.      Sample handling and custody shall be consistent with the above referenced EPA guidance for developing QAPPs and with the analytical methods listed in Paragraph 4 of this Appendix.

iii.      Analytical methods:

1.      Air samples shall be analyzed using the EPA Method TO-15 for the Determination of Volatile Organic Compounds (VOCs) in Air

2

Collected in Specially-Prepared Canisters and Analyzed by Gas Chromatography/ Mass Spectrometry (GC/MS).

2. Wastewater samples shall be analyzed using EPA Method 624 for Organic Chemical analysis of Municipal and Industrial Wastewater for all compounds listed for Method 624 in 40 CFR § 136 Appendix A.

3. Where applicable, the detection limits of the wastewater analysis shall be below the limits established in the current version of Administrative Order No. CSID-S-SIU-16 issued to CSI on December 9, 2016.

6. <u>Health and Safety Plan</u>.  Within 75 days of the Effective Date of the Consent Decree, Defendant shall submit a health and safety plan that ensures the protection of workers and the public during the performance of any activities required under the Monitoring Work Plan to EPA.

7. <u>Photographs</u>. Within 10 days of commencing the monitoring, CSI shall submit photographs of the monitoring device(s), as installed, to EPA, NEORSD, and Cleveland.

8. <u>Reporting</u>. After each month of monitoring, on or before the 15th day of the following month, CSI shall submit a report to EPA, NEORSD, and Cleveland that includes all data collected from the monitoring devices in Microsoft Excel workbook or compatible format and a description of any maintenance or changes made to the equipment in accordance with the QAPP. Each report required under this Appendix must include the names and titles of each person who played a role in preparing the report and gathering the data.

9. <u>Duration</u>. CSI must continue monitoring for a period of at least six months. After six months, CSI may cease monitoring unless directed to continue by EPA before the end of the six-month period. If so directed, CSI shall continue monitoring in conformity with the Monitoring Work Plan for additional six-month periods until there is no request to continue such monitoring by EPA.